**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 2 7 2025

TAMMY H. DOWNS, CLERK
By:_____
⎯⎯⎯⎯⎯⎯⎯ DEP CLERK

<u>UNITED STATES DISTRICT COURT</u>
<u>EASTERN DISTRICT OF ARKANSAS</u>
Central Division

JASMINE MOORE, individually and
on behalf of all others similarly situated,

    *Plaintiff,*

v.

**MAINLINE HEALTH SYSTEMS, INC.**

    *Defendant.*

Case No. **4:25-cv-647-DPM**

CLASS ACTION COMPLAINT

JURY DEMAND

This case assigned to District Judge **Marshall**
and to Magistrate Judge **Kearney**

<u>CLASS ACTION COMPLAINT</u>

    COMES NOW Plaintiff Jasmine Moore, individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to her and upon information and belief as to all other matters, and by and through undersigned counsel, hereby brings this Class Action Complaint against Defendant Mainline Health Systems, Inc. ("Mainline"), and alleges as follows:

<u>INTRODUCTION</u>

    1.    Plaintiff brings this action on behalf of himself and all other individuals similarly situated ("Class Members") against Mainline for its failure to secure and safeguard the personally identifiable information ("PII") and private health information ("PHI") of Plaintiff and Class Members.

    2.    Mainline Health Systems, Inc. is a healthcare services provider incorporated in the State of Delaware and maintains its corporate offices and principal place of business in Portland, Arkansas. In the regular course of its business, Mainline is required to maintain reasonable and adequate security measures to secure, protect, and safeguard its customers' PII/PHI against unauthorized access and disclosure.

1

3.      On or about April 10, 2024, an unauthorized third party gained access to Mainline's network systems and accessed and copied files containing PII/PHI of Mainline's patients and the PII/PHI

4.      Mainline owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard its PII/PHI against unauthorized access and disclosure. Mainline breached that duty by, among other things, failing to, or contracting with companies that failed to, implement and maintain reasonable security procedures and practices to protect its patients' PII/PHI from unauthorized access and disclosure. Every year, millions of Americans have its most valuable PII stolen and sold online because of data breaches. Despite the dire warnings about the severe impact of data breaches on Americans of all economic strata, companies still fail to make the necessary investments to implement important and adequate security measures to protect its customers' and employees' data.

5.      Mainline required its customers to provide it with its sensitive PII/PHI and failed to protect it. Mainline had an obligation to secure its customers' PII/PHI by implementing reasonable and appropriate data security safeguards. This was part of the bargain between Plaintiff and Class Members and Mainline.

6.      As a result of Mainline's failure to provide reasonable and adequate data security, Plaintiff's and the Class Members' unencrypted, non-redacted PII/PHI has been exposed to unauthorized third parties. Plaintiff and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive PII/PHI stolen here and the fact that the compromised PII/PHI is already being sold on the dark web. This risk constitutes a concrete injury suffered by Plaintiff and the Class as they no longer have control over its PII/PHI, which PII/PHI is now in the hands of third-party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish

2

standing.

7.      Plaintiff and the Class will have to incur costs to pay a third-party credit and identity theft monitoring service for the rest of its lives as a direct result of the Data Breach.

8.      Plaintiff brings this action on behalf of himself and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring Mainline to ensure that its third-party vendors implement and maintain reasonable data security practices going forward.

**THE PARTIES**

9.      Plaintiff Jasmine Moore is a resident of the state of Arkansas, whose personal information was compromised in the Data Breach.

10.     Defendant Mainline Health Systems, Inc. is an Arkansas corporation, with its principal place of business located at 583 West Gaines, Monticello, Arkansas 71655.

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d) because there are more than 100 Class Members, at least one class member is a citizen of a state different from that of Defendant, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

12.     This Court has personal jurisdiction over Defendant Mainline Health Systems, Inc. because it maintains its principal place of business in Arkansas.

13.     This Court has personal jurisdiction over Defendant Nationwide Recovery Services, Inc. because it transacts business in this State and contracts for goods or services in this

State.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant Mainline Medical Holding, Inc.'s principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's and Class Members claims occurred in this District.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

15.     This is a class action brought by Plaintiff, individually and on behalf of all citizens who are similarly situated (i.e. the Class Members), seeking to redress Defendant's willful and reckless violations of his privacy rights. Plaintiff and the other Class Members were customers of Defendant.

16.     On or about April 10, 2024, an unauthorized third party accessed and downloaded Plaintiff's and the Class Members' PII/PHI.

17.     This action pertains to Defendant unauthorized disclosures of the Plaintiff's PII/PHI that occurred on or about April 10, 2024 (the "Breach").

18.     Defendant disclosed Plaintiff's and the other Class Members' PII/PHI to unauthorized persons as a direct and/or proximate result of Defendant's failure to safeguard and protect its PII/PHI.

19.     By obtaining, collecting, and storing the PII/PHI of Plaintiff and Class Members, Mainline assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII/PHI from unauthorized disclosures.

20.     Despite recognizing its duty to do so, Mainline failed to assess and monitor NRS's security safeguards to protect Plaintiff's and the Class Members' PII/PHI.

21.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of its PII/PHI and relied on Mainline to keep its PII/PHI confidential and maintained

4

securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

### *The Data Breach*

22.     According to a data breach notification ("Breach Notice") issued by Mainline Health Systems, Inc., it discovered unauthorized access to its network systems occurring on or about April 10, 2024. During this time, an unauthorized third party accessed and copied files containing personally identifiable information and health information ("PII" and "PHI") on the Mainline network, including full names in combination with date of birth, Social Security Number, Date of Birth, US Drivers License Number,  Financial Account Number, Financial Account Access Information, Payment Card Number, Payment Card Access Information, Medical Record Number, Patient ID, Medicaid Number, Health Insurance Policy Number, Health Insurance Group Number, Medical Diagnosis information, Medical Treatment Procedure Information, Clinical Information, Prescription Information, Provider Location, Provider Name.

23.     The Breach Notice provided to affected individuals did not specify detailed measures or actions taken by Mainline to fully remediate the vulnerabilities that led to the Data Breach, nor did it explain specific measures adopted to prevent future incidents.

### *The Data Breach was Preventable*

24.     Had Mainline ensured that it industry-standard safeguards to monitor, assess, and update security controls and related system risks, Mainline could have ensured sensitive customer data was protected. Mainline's lack of security controls are inexcusable.

25.     Defendant was at all times fully aware of its obligation to protect customers' PII/PHI and the risks associated with failing to do so. Defendant knew that information of the type it collected, maintained, and stored is highly coveted and a frequent target of hackers.

26.     This exposure, along with the fact that the compromised PII/PHI is potentially being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:



27.     By 2013, it was being reported that nearly one out of four data breach notification recipients becomes a victim of identity fraud.[1]

28.     Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

29.     When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[2]

30.     In April 2023, NationsBenefits, "disclosed that thousands of its members had its personal information compromised in a late-January ransomware attached targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports,

---

[1] Pascual, Al, "2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters," *Javelin* (Feb. 20, 2013).
[2] *Shining a Light on the Dark Web with Identity Monitoring*, IdentityForce, Dec. 28, 2020, *available at:* https://www.identityforce.com/blog/shining-light-dark-web- identity- monitoring (last accessed July 28, 2021).

the ransomeware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously known vulnerability."[3]

31.    In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting its insurers."[4]

32.    In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million patients was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office dated May 26, the firm said that it detected unauthorized access to its systems on March 6, with some found to be infected with malicious code...According to MCNA, the hackers were successful in accessing patient personal information."[5]

33.    In April 2020, ZDNet reported in an article titled, "Ransomeware mentioned in 1,000+ SEC filings over the past year", that "[r]ansomeware gangs are now ferociously aggressive in its pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[6]

34.    In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomeware Guide" advising that "[m]alicious actors have adjusted its ransomeware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary

---

[3] https://www.insurancebusinessmag.com/us/guides/the-insurance-industry-cyber-crime-
report-recent-attacks-on-insurance-businesses-448429.aspx (Last visited August 22, 2023).
[4] *Id.*
[5] *Id.*
[6] https://www.zdnet.com/article/ransomeware-mentioned-in-1000-sec-filings-over-the-past-year/ (Last visited August 22, 2023).

forms of extortion."[7]

35.    Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, "are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. As data breaches in the news continue to show, PII about employees, customers, and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[8]

36.    The PII of consumers remains of high value to criminals, as evidenced by the price they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[9] Experian reports that a solen credit or debit card number can sell for $5 to $110 on the dark web.[10] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[11]

37.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult

---

[7] https://www.cisa.gov/sites/default/files/2023-01-CISA_MS-
ISAC_Ransomware%20Guide_8508C.pdf (Last visited August 22, 2023).

[8] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor, April 3, 2018, *available at:* https://www.armor.com/resources/blog/s tolen-pii-ramifications- identity-theft- fraud-dark-web/ (Last visited July 28, 2021).

[9] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at:* https://www.digitaltrends.com/computing/personal- data-sold- on-the-dark-web-how-much-it-costs/ (Last visited July 28, 2021).

[10] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at:* https://www.experian.com/blogs/ask- experian/heres-how-much- your-personal-information-is-selling-for-on-the-dark-web/ (Last visited July 28, 2021).

[11] *In the Dark*, VPNOverview, 2019, *available at:* https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (Last visited July 28, 2021).

for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[12]

38.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

39.     Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[13]

40.     Because of this, the information comprised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not

---

[12] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (Last visited August 22, 2023).

[13] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen- by-anthem-s-hackers-has-millionsworrying- about-identity-theft (last visited July 28, 2021).

impossible, to change.

41.    The PII compromised in the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[14]

42.    Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

43.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached its highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

44.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

45.    Data breaches facilitate identity theft as hackers obtain consumers' PII and thereafter use it to siphon money from current accounts, open new accounts in the names of its victims, or sell consumers' PII to others who do the same.

46.    For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[15] The GAO

---

[14] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells- for-10x-price-of-stolen-credit-card-numbers.html (last visited July 28, 2021).

[15] *See* Government Accountability Office, *Personal Information: Data Breaches are Frequent,*

Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will fact, "substantial costs and inconveniences repairing damage to its credit records… [and its] good name."[16]

47.     The exposure of Plaintiff's and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off this highly sensitive information.

### *Defendant Failed to Comply with the Federal Trade Commission*

48.     Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[17]

49.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established guidelines for fundamental data security principals for business.[18] Among other things, the guidelines note businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand its network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it

---

*but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (June 2007), https://www.gao.gov/assets/gao- 07-737.pdf (last visited July 28, 2021).
[16] *Id.*
[17] *See* Federal Trade Commission, *Start With Security* (June 2015), https://www.ftc.gov/system/files/documents/plain- language/pdf0205-startwithsecurity.pdf (last visited July 28, 2021).
[18] *See* Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited August 22, 2023).

occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted form the system; and have a response plan ready in the event of a breach.[19]

50.    Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[20]

51.    Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet its data security obligations.

### *The Impact of Data Breach on Victims*

52.    Defendant'ss failure to keep Plaintiff's and Class Members' PII/PHI secure has severe ramifications. Given the highly sensitive nature of the PII/PHI stolen in the Data Breach, Social Security numbers, first and last names, dates of birth, and medical information, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff has suffered injury and faces an imminent and substantial risk of further injury including identity theft and related cybercrimes due to the Data Breach.

53.    The PII exposed in the Data Breach is highly-coveted and valuable on underground

---

[19] *Id.*
[20] Federal Trade Commission, *Start With Security*, *supra footnote 17*.

markets. Identity thieves can use the PII to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

54.    Further, malicious actors often wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring its accounts after a significant period has passed. These bad actors will also re-use stolen PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

55.    Given the confirmed exfiltration of Mainline's customers' PII/PHI, many victims of the Data Breach have likely already experienced significant harms as the result of the Data Breach, including, but not limited to, identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, checking credit reports, and spending time and effort searching for unauthorized activity.

56.    It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;
- 76% felt violated;
- 32% experienced financial related identity problems;
- 83% reported being turned down for credit or loans;
- 32% reported problems with family members as a result of the breach;

13

- 10% reported feeling suicidal.[21]

57.    Identity theft can also exact a physical toll on its victims. The same survey reported

that respondents experienced physical symptoms stemming from its experience with identity theft:

- 48% reported sleep disturbances;

- 37.1% reported an inability to concentrate/lack of focus;

- 28.7% reported they were unable to go to work because of physical

    symptoms;

- 23.1 reported new physical illnesses (aches and pains, heart palpitations,

    sweating, stomach issues); and

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[22]

58.    Annual monetary losses from identity theft are in the billions of dollars.

According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts…individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.

> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in its credit reports and monitor its reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

59.    The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent

value to its owner, which has been recognized by courts as an independent form of harm.[23]

---

[21]https://www.idtheftcenter.org/wpcontent/uploads/2021/09/ITRC_2021_Consumer_Aftermath_ Report.pdf (Last visited June 8, 2025).

[22] *Id.*

[23] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to

60.    Consumers are injured every time its data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intent to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

61.    As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

    a.    The unconsented disclosure of confidential information to a third party;

    b.    Unauthorized use of its PII/PHI without compensation;

    c.    Losing the value of the explicit and implicit promises of data security;

    d.    Losing the value of access to its PII/PHI permitted by Mainline without its permission;

    e.    Identity theft and fraud resulting from the theft of its PII/PHI;

    f.    Costs associated with the detection and prevention of identity theft and unauthorized use of its financial accounts;

    g.    Anxiety, emotional distress, and loss of privacy;

    h.    The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

    i.    Unauthorized charges and loss of use of and access to its accounts;

    j.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

    k.    Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address

---

acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of its personal information and offer it in exchange for goods and services.").

the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l.   The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by its PII/PHI being in the possession of one or more unauthorized third parties.

62.   Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. The Department of Justice's Bureau of Justice Statistics found that identity theft victims, "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.[24]

63.   Plaintiff and Class Members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more to work with a provider that has better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[25]

64.   Plaintiff and Class Members have a direct interest in Defendant'ss promises and duties to protect its PII/PHI, i.e., that Defendant *not increase* its risk of identity theft and fraud. Because Defendant failed to live up to its promises and duties in this respect, Plaintiff and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by Defendant's wrongful conduct. Through this remedy, Plaintiff seeks to restore themselves and Class Members as close

---

[24] E. Harrell, U.S. Department of Justice, *Victims of Identity Theft, 2014* (revised Nov. 14, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf (Last visited August 22, 2023).

[25] https://web.archive.org/web20220205174527/https://www.fireeye.com/blog/executive-perspective/2016/05/beyong_the_bottomli.html (Last visited August 15, 2023).

to the same position as they would have occupied but for Defendant's wrongful conduct, namely its failure to adequately protect Plaintiff's and the Class Members' PII/PHI.

65.    Plaintiff and Class Members further seek to recover the value of the unauthorized access to its PII/PHI permitted through Defendant's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by. Another does not diminish the rights- holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a nonpracticing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiff and Class Members have a protectible property interest in its PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

66.    Plaintiff and Class Members have an interest in ensuring its PII is secured and not subject to further theft because Defendant continue to hold its PII.

## CLASS ACTION ALLEGATIONS

67.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and the following proposed Nationwide class, defined as follows:

### Nationwide Class

All persons residing in the United States whose personally identifiable information or personal health information was accessed by and disclosed in the Data Breach to

unauthorized persons, including all who were sent a notice of the Data Breach.

68.    The proposed Nationwide Class will be referred to as the Class.

69.    Excluded from the proposed Class are any officer or director of Defendant; any officer or director of any affiliate, parent, or subsidiary of Mainline or NRS; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

70.    **Numerosity.** Members of the proposed Class are likely to number in the tens of thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from Defendant's own records.

71.    **Commonality and Predominance.** Common questions of law and fact exist as to the proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

   a.    Whether Defendant engaged in the wrongful conduct alleged herein;

   b.    Whether Defendant'ss inadequate data security measures were a cause of the Data Breach;

   c.    Whether Defendant owed a legal duty to Plaintiff and the other Class Members to exercise due care in collecting, storing, and safeguarding its PII;

   d.    Whether Defendant negligently or recklessly breached legal duties owed to Plaintiff and the Class Members to exercise due care in collecting, storing, and safeguarding its PII;

   e.    Whether Plaintiff and the Class are at an increased risk for identity theft because of the Data Breach;

   f.    Whether Defendant failed to implement and maintain reasonable security procedures and practices for Plaintiff's and Class Members' PII in violation of Section 5 of the FTC Act;

   g.    Whether Plaintiff and the other Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

72.    Defendant engaged in a common course of conduct giving rise to the legal rights

sought to be enforced by Plaintiff, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

73. **Typicality:** Plaintiff's claims are typical of the claims of the Members of the Class. All Class Members were subject to the Data Breach and had its PII or PHI accessed by and/or disclosed to unauthorized third parties. Defendant's misconduct affected all Class Members in the same manner.

74. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because its interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and its counsel.

75. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to litigate its claims on an individual basis against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single

court.

## COUNT I
## NEGLIGENCE

76.     The preceding factual statements and allegations are incorporated herein by reference.

77.     Defendant owed a duty to Plaintiff and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' PII/PHI from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing its data security systems to ensure that Plaintiff's and Class Members' PII/PHI in Defendant's possession was adequately secured and protected.

78.     Defendant owed, and continues to owe, a duty to Plaintiff and the other Class Members to safeguard and protect its PII/PHI.

79.     Defendant breached its duty by failing to exercise reasonable care and failing to safeguard and protect Plaintiff's and the other Class Members' PII/PHI.

80.     It was reasonably foreseeable that Defendant's failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class Members' PII/PHI would result in an unauthorized third-party gaining access to such information for no lawful purpose.

81.     As a direct result of Defendant's breach of its duty of confidentiality and privacy and the disclosure of Plaintiff's and the member of the Class confidential medical information, Plaintiff and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into its privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

82.     By engaging in the negligent acts and omissions alleged herein, which permitted an

unknown third party to access NRS's systems containing the PII/PHI at issue, Defendant failed to meet the data security standards set forth under Section 5 of the FTC Act, which prohibits "unfair…practices in or affecting commerce." This prohibition includes failing to have adequate data security measures, which Defendant have failed to do as discussed herein.

83.    Defendant's failure to meet this standard of data security established under Section 5 of the FTC Act is evidence of negligence.

84.    Neither Plaintiff nor other Class Members contributed to the Data Breach as described in this Complaint.

85.    Defendant's wrongful actions and/or inaction and the resulting Breach (as described above) constituted (and continue to constitute) negligence at common law.

86.    As a result of Defendant's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of its PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of its PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to its PII/PHI which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

### COUNT II
### UNJUST ENRICHMENT

87.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

88.    This claim is pleaded in the alternative to the breach of implied contract claim.

89.    Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of monies paid to Mainline healthcare or related services, which Mainline in turn used to pay NRS for its services, with an implicit understanding that Defendant would use some of these payments to protect the PII/PHI they collect, store, and use to provide health care.

90.    Defendant accepted or had knowledge of the benefits conferred upon them by Plaintiff and Class members. Defendant also benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this was used to facilitate billing and payment services and other aspects of Defendant's business.

91.    As a result of Defendant's conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between its payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

92.    Defendant should not be permitted to retain the money belonging to Plaintiff and Class members because Defendant failed to adequately implement the data privacy and security procedures that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

93.    Defendant should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Petition, respectfully request that the Court enter judgment in its favor and against Defendant, as follows:

A.  Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing Plaintiff's counsel as Lead Counsel for the Class;

B.  Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.  Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.  Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.  Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.  Awarding Plaintiff and the Class such other favorable relief as allowable under law.


Dated: June 27, 2025

Respectfully submitted,

Christopher D. Jennings
(AR Bar No.2006306)
**JENNINGS & EARLEY PLLC**
500 President Clinton Ave., Ste. 110
Little Rock, AR 72201
501-255-8569
chris@jefirm.com


*Attorney for Plaintiff and the Class*